**IN THE COURT OF APPEALS OF IOWA**

No. 17-0395
Filed May 2, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**SEAN DAVID GORDON,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Floyd County, DeDra L. Schroeder,

Judge.


        A convicted sex offender alleges the district court impermissibly considered

his risk assessment scores in sentencing him to prison.  **SENTENCE VACATED**

**AND REMANDED FOR RESENTENCING.**


        Mark C. Smith, State Appellate Defender, and Martha J. Lucey, Assistant

Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Linda J. Hines, Assistant Attorney

General, for appellee.


        Heard En Banc.

**TABOR, Judge.**

Sean Gordon pleaded guilty to the statutory rape of a fourteen-year-old girl. For this first offense, he received a prison sentence not to exceed ten years. He now asks to be resentenced, alleging the district court improperly decided he should be incarcerated based, in part, on his "risk level scores" derived from two sex-offender risk assessment tools included in a psychosexual evaluation appended to the presentencing investigation (PSI) report. Because we find no statutory authority for using these scores for this purpose, we reverse and remand for resentencing.

## I.      Facts and Prior Proceedings

Fourteen-year-old A.G. knew twenty-four-year-old Gordon as a family friend. They went disc golfing with other family members. But Gordon took a sexual interest in the teenager and encouraged her to exchange nude photographs with him. Eventually Gordon drove A.G. to a remote location where he perpetrated a vaginal sex act against her.

After A.G. disclosed the incident to her mother, the Floyd County Attorney charged Gordon with sexual abuse in the third degree, a class "C" felony, in violation of Iowa Code section 709.4(1)(b)(3)(d) (2016) (criminalizing a sex act between a fourteen year old and a defendant four or more years older). Gordon pleaded guilty to the felony offense. As part of the plea agreement, both the defense and the State were free to advocate for any available sentence. The district court accepted Gordon's plea and ordered the district department of corrections to complete a PSI report.

According to the PSI report, Gordon was charged with possession of methamphetamine two weeks after the plea proceeding.  The report noted,

> [S]ince the Defendant has [pleaded] guilty in this case he has continued to engage in high risk behavior.  This is evident by the fact the Defendant was arrested in Chickasaw County on January 22, 2017 and charged with drug possession.  Furthermore the Defendant was with a Juvenile female that was reported as missing by her parents.

As part of the presentence investigation, Gordon's probation officer referred him for a psychosexual assessment.  A staff psychologist for the department of correctional services performed the evaluation in late January 2017.  The psychologist explained her report "was prepared to assess Mr. Gordon's potential risk to the community, treatment needs, and amenability to treatment."  At the conclusion of her report, the psychologist noted her report was "prepared expressly for the Second District Department of Correctional Services."  The psychologist's report included two sex-offender risk assessment tools: the STATIC-99R and the SOTIPS (Sex Offender Treatment Intervention and Progress Scale).

The report described the STATIC-99R as an instrument based on ten "empirically driven risk factors" which was designed to "assist in the prediction of sexual and violent recidivism for sexual offenders."[1]  The instrument scored offenders in five risk categories.  The instrument's description contained the following caution: "The recidivism estimates provided by the STATIC-99R are

---

[1] The ten risk factors were: (1) less than 35 years old; (2) having never lived with a lover for two continuous years, (3) having committed a current non-sexual violent offense, (4) having a history of non-sexual violence, (5) prior sexual offenses, (6) the number of previous sentencing dates, (7) having a history of non-contact sex offense, (8) having unrelated victims, (9) having stranger victims, and (10) having male victims.

group estimates based on reconvictions and were derived from groups of individuals with these characteristics. As such, these estimates do not directly correspond to the recidivism risk of an individual offender." The psychologist scored Gordon as an "average risk" on the STATIC-99R.

The report described the SOTIPS instrument as "a sixteen-item statistically derived dynamic measure designed to aid in assessing risk, treatment, and supervision needs, and progress among adult male sex offenders."[2] The SOTIPS scores fall into three risk categories: low, moderate, and high. The psychologist recorded Gordon's score in the high-risk category.

The author of the PSI report recommended Gordon receive a suspended sentence and, as a term of his probation, that he be placed at the BeJe Clark Center, a community-based residential facility, for 180 days or until maximum benefits were achieved. The recommendation for community supervision related to the author's concern that Gordon needed a more structured environment than street probation considering his post-plea arrest and his reluctance to take full responsibility for the offense.

At the March 2017 sentencing hearing, A.G.'s mother gave a victim impact statement, telling the court that her daughter was in therapy and had significant "emotional scars" from the crime. The State recommended an indeterminate

---

[2] The sixteen risk factors were (1) sex offense responsibility, (2) sexual behavior, (3) sexual attitudes, (4) sexual interests, (5) sexual risk management, (6) criminal and rule-breaking behavior, (7) criminal and rule-breaking attitudes, (8) stage of change, (9) cooperation with treatment, (10) cooperation with community supervision, (11) emotion management, (12) problem solving, (13) impulsivity, (14) employment, (15) residence, and (16) social influences.

prison term of ten years. As a basis for its recommendation, the State cited Gordon's Chickasaw County arrest:

> And during that arrest, he had a different minor female who was a runaway from Floyd County in his vehicle. And that provides a lot of concerns to the State as far as the safety of the community. It shows the types of choices that he's continuing to make and shows that there's nothing to stop him from reoffending in the future.

Gordon's counsel objected to the court's consideration of the Chickasaw County arrest "as those are just charges." Counsel asked for a deferred judgment and street probation, noting her client had no criminal history and was starting to address his substance-abuse problem. In his allocution, Gordon took responsibility for his sex offense, saying he knew what he did was wrong. Gordon told the court he had moved back in with his parents, was staying away from his drug-using friends, and was trying to get a job. Gordon also addressed his post-plea arrest, admitting he had a juvenile in his vehicle, but saying he did not know she was a runaway and contending he was just giving her and her boyfriend a ride.

In deciding what sentence to impose, the district court looked at Gordon's age, his prior record, his family circumstances, his financial condition, and his employment history. The court also considered Gordon's "potential for rehabilitation" and "if that can be accomplished in the community versus a more structured environment like prison." The court noted Gordon had not consistently taken responsibility for committing the sex offense, signaling he may not be "amenable" to treatment. The court also expressed concern about Gordon's "continued high-risk behavior being with a juvenile female who obviously has got other issues going on, and a possession of methamphetamine floating around there also." The court acknowledged the arrest was not a conviction but

nevertheless considered Gordon's post-plea behavior as an indication he had not received the expected "wake-up call" from this prosecution. The court cited Gordon's "long history of drug abuse" and his admission that use of methamphetamine made him "less sexually inhibited."

The district court then addressed the psychosexual evaluation:

> I note that on the STATIC-99R score, which was a risk level score, you were given a Level III, average risk. On the SOTIPS score, you were given a high risk assessment, placed in a high-risk category. And what that sex offender treatment intervention progress scale is supposed to tell me is your supervision needs, your progress—basically, what progress we can anticipate through treatment, taking responsibility, looks at a lot of different factors. And that places you as high risk. Treatment amenability is based upon looking at your willingness to admit your behavior and take responsibility and the level of risk you pose to the community.

In the next breath, the court declared: "All of these things, in looking at it, tell me that an appropriate sentence in this matter would sentence you up to ten years in the Iowa state prison system." The court rejected the recommendation in the PSI report to suspend the sentence. Gordon appeals.

## II.    Scope and Standards of Review

Generally, we review sentencing decisions for correction of legal error. *State v. Letscher*, 888 N.W.2d 880, 883 (Iowa 2016). We review constitutional questions in sentencing cases de novo. *State v. Bruegger*, 773 N.W.2d 862, 869 (Iowa 2009).

If the sentencing court "uses any improper consideration, resentencing of the defendant is required." *State v. Grandberry*, 619 N.W.2d 399, 401 (Iowa 2000) (citing *State v. Gonzalez*, 582 N.W.2d 515, 517 (Iowa 1998)). Because we cannot speculate about the weight the sentencing court assigned to any given factor or

divine which factor tipped the scales toward incarceration, resentencing is required even if the troubling factor was "merely a 'secondary consideration.'" *See id.* (quoting *State v. Messer*, 306 N.W.2d 731, 733 (Iowa 1981)).

### III. Analysis of Sentencing Issues

Gordon complains about two aspects of the sentencing hearing.[3] First, he argues the district court violated his right to due process by considering and relying on the sex-offender-risk-assessment instruments attached to the PSI report.[4] Second, he contends the district court abused its discretion by relying on his post-plea arrest when imposing a sentence of incarceration.

Gordon frames his objection to the risk assessments as a constitutional argument based on *Townsend v. Burke*, 334 U.S. 736, 741 (1948) (finding sentences based on material misinformation or erroneous assumptions violate due process). But not every mistake which occurs during sentencing gives rise to a due process violation. *See State v. Foy*, 574 N.W.2d 337, 339 (Iowa 1998) (noting Foy "attempts to place his appeal on constitutional grounds" by alleging his due

---

[3] As a back-up argument, Gordon contends his counsel provided ineffective assistance in not challenging the sentencing procedure and PSI report as a due process violation. The State does not contest error preservation. We likewise conclude Gordon's claims are not subject to "traditional preservation of error or waiver constraints." *See Bruegger*, 773 N.W.2d at 870.

[4] We acknowledge defense counsel's failure to object to the contents of the PSI ordinarily constitutes a failure to preserve error. *See Grandberry*, 619 N.W.2d at 401–02. The fact that the department of corrections and the parole board rely upon risk assessments scores to make some of their decisions does not make it a permissible sentencing factor. Moreover, we are not convinced Gordon or his attorney could have envisioned that what was proper for the PSI writer to consider in making a recommendation for probation considerations would be improperly used by the district court as a basis to imprison the defendant. Much like the defendant's race may be identified in a PSI, defense counsel would not envision that a court would rely upon race as a basis to imprison the defendant and feel a need to object to the PSI on that basis. And certainly no one would question that race would be an improper sentencing factor. Thus, we conclude Gordon's failure to object to the PSI does not raise an error preservation issue.

process rights were violated when he was not allowed to withdraw his plea but finding no issue of "fundamental fairness" our supreme court reviewed for "abuse of discretion"); *see also State v. Ashley*, 462 N.W.2d 279, 282 (Iowa 1990) (explaining basic requirements of due process have been codified in Iowa Code section 901.3 regarding factors to be considered in the PSI). In addressing Gordon's first complaint, we decline to reach the constitutional attack on the sentencing court's decision.[5] "[W]e prefer to decide cases on nonconstitutional grounds when possible even though the constitutional issue has been properly presented." *See State v. Ochoa*, 244 N.W.2d 773, 775 (Iowa 1976); *see also State v. Weitzel*, 905 N.W.2d 397, 403 (Iowa 2017) (declining "to strictly demarcate a clear line between rule-based and due-process claims"); *In re S.P.*, 672 N.W.2d 842, 846 (Iowa 2003) (confining analysis to statutory law because notice had to satisfy "Iowa statutory test as well as the test of due process" (citation omitted)). Because Gordon contends "it was improper for the district court to consider the risk assessment scores in determining the appropriate sentence" we treat his claim as contesting an impermissible sentencing factor.[6]

---

[5] In its routing statement, the State contends the record in this case is inadequate to address the constitutional concern raised by Gordon and urges the supreme court to "save its comment on the use of actuarial risk assessment instruments at sentencing for another day."

[6] This approach is consistent with our analysis in *State v. Guise*, No. 17-0589, __WL__ (Iowa Ct. App. May 2, 2018) also issued today.

## A. Risk-Assessment Scores

Gordon asserts the district court impermissibly relied on his risk-assessment scores when deciding incarceration was necessary.[7]  He contends the district court was not aware of the limitations of these risk-assessment tools, and he faults the PSI report for not containing the necessary cautions concerning the appropriate use of the STATIC-99R and SOTIPS instruments.  The State counters that because "Gordon does not contest the accuracy of the risk assessment instruments contained in the PSI" he cannot show his sentencing hearing was flawed.  At oral argument, counsel for Gordon clarified the concern was not necessarily with the accuracy of his risk-assessment scores but with their "off-label" use as an aggravating factor at his sentencing hearing.[8]

---

[7] The use of algorithms in sentencing decisions has garnered national attention.  *See, e.g,* Anna Maria Barry-Jester, Ben Casselman & Dana Goldstein, *Should Prison Sentences Be Based on Crimes That Haven't Been Committed Yet?*, FiveThirtyEight in collaboration with The Marshall Project (August 4, 2015), https://fivethirtyeight.com/features/prison-reform-risk-assessment/ ("The risk assessment trend is controversial.  Critics have raised numerous questions: Is it fair to make decisions in an individual case based on what similar offenders have done in the past? . . .  Even some supporters of risk assessment in bail and parole worry that using the tools for sentencing carries echoes of 'Minority Report': locking people up for crimes they might commit in the future.").  Some scholars have expressed concern about a disparate impact from the use of recidivism prediction instruments.  *See* Alexandra Chouldechova, *Fair Prediction with Disparate Impact: A Study of Bias in Recidivism Prediction Instruments*, 14 (February 2017), https://arxiv.org/pdf/1703.00056.pdf (concluding "there is a large body of literature showing that data-driven risk assessment instruments tend to be more accurate than professional human judgments, and investigating whether human-driven decisions are themselves prone to exhibiting racial bias.  We should not abandon the data-driven approach on the basis of negative headlines.  Rather, we need to work to ensure that the instruments we use are demonstrably free from the kinds of biases that could lead to disparate impact in the specific contexts in which they are to be applied").

[8] *See* Steven L. Chanenson & Jordan M. Hyatt, *The Use of Risk Assessment at Sentencing: Implications for Research and Policy*, 7 (Villanova Pub. Law and Legal Theory Working Paper Series, Working Paper No. 2017-1040), http://ssrn.com/abstract=2961288 (explaining "off-label" term was borrowed from the medical world where it means using a pharmaceutical approved by the Food and Drug Administration for an unapproved purpose) [hereinafter Chanenson].  According to these scholars, off-label use of risk assessments at sentencing is concerning because "there is little evidence to support

Gordon finds support for his position from *Malenchik v. State*, 928 N.E.2d 564, 568 (Ind. 2010) (analyzing sentencing court's use of "scoring models" or "assessment tools" known as Level of Service Inventory-Revised (LSI-R) and Substance Abuse Subtle Screening Inventory (SASSI)). The *Malenchik* court reasoned:

> [N]either the LSI–R nor the SASSI are intended nor recommended to substitute for the judicial function of determining the length of sentence appropriate for each offender. But such evidence-based assessment instruments can be significant sources of valuable information for judicial consideration in deciding whether to suspend all or part of a sentence, how to design a probation program for the offender, whether to assign an offender to alternative treatment facilities or programs, and other such corollary sentencing matters.

928 N.E.2d at 573 (affirming sentence because trial court did not rely on risk assessments as an aggravating factor). The court further explained: "The results of an LSI–R or SASSI assessment are not in the nature of, nor do they provide evidence constituting, an aggravating or mitigating circumstance." *Id.* at 575. This principle from *Malenchik* was incorporated into a comprehensive report by the National Center for State Courts. Pamela M. Casey et al., *Using Offender Risk and Needs Assessment Information at Sentencing: Guidance for Courts from a National Working Group*, National Center for State Courts (2011) http://www.ncsc.org/~/media/microsites/files/csi/rna%20guide%20final.ashx [hereinafter Casey]. The report opined: "Risk and need assessment information should be used in the sentencing decision to inform public safety considerations related to offender risk reduction and management. It should

---

accuracy of the methodology in that context or for the unanticipated and unvalidated use." *Id.*

not be used as an aggravating or mitigating factor in determining the severity of an offender's sanction." Casey, *supra*, at 11.

Gordon also relies on *State v. Loomis*, 881 N.W.2d 749, 753 & n.10 (Wis. 2016) (analyzing sentencing court's use of COMPAS (Correctional Offender Management Profiling for Alternative Sanctions)). The *Loomis* court concluded the COMPAS risk assessment could be used at sentencing but "circumscribed" its use by explaining "limitations" that Wisconsin sentencing courts "must observe in order to avoid potential due process violations." 881 N.W.2d at 757. For example, the court held, "[R]isk scores may not be used as the determinative factor in deciding whether the offender can be supervised safely and effectively in the community." *Id.* at 769 (citing Casey, *supra*, at 14).[9] Due process implications also compelled the *Loomis* court to caution its sentencing courts that risk assessment scores are "based on group data" and thus are able to identify groups of high-risk offenders, but "not a particular high risk individual." *Id.* at 765.

Gordon acknowledges Iowa's appellate courts have yet to address the proper use of risk assessment tools in sentencing. But he argues the sentencing court's reference to his scores on the STATIC-99R and SOTIPS—as a tipping point in its decision to send him to prison—ran afoul of the cautions voiced by other state appellate courts in *Malenchik* and *Loomis*, as well as the report from the National Center for State Courts.

---

[9] Casey opines that an offender's risk score may be relevant in weighing release and monitoring options but "should never be determinative" in deciding whether the offender should be supervised in the community.

In appraising Gordon's argument, we focus on Iowa's statutory guidelines for sentencing. Sentencing courts must keep in mind the societal goals of rehabilitating the offender and protecting the community from further offenses. Iowa Code § 901.5; *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). In determining if the punishment fits the crime, the sentencing court must weigh "the nature of the offense, the attending circumstances, defendant's age, character and propensities and chances of his reform." *State v. Cupples*, 152 N.W.2d 277, 280 (Iowa 1967). In addition, before deferring judgment or suspending a sentence, the district court must consider the following factors: the defendant's age, prior record, employment and family circumstances, mental-health and substance-abuse history, the nature of the offense, and other appropriate factors. Iowa Code § 907.5(1)(a)–(g).

Presentence investigations assist sentencing courts in this process. *See id.* § 901.2(1) ("[T]he court shall receive from the state, from the judicial district department of correctional services, and from the defendant any information which may be offered which is relevant to the question of sentencing. The court may consider information from other sources."). PSI reports have a two-fold purpose: (1) "to provide the court pertinent information for purposes of sentencing" and (2) "to include suggestions for correctional planning for use by correctional authorities subsequent to sentencing." *Id.* § 901.2(4). PSI reports must inquire into the following: (1) the defendant's characteristics, family and financial circumstances, needs, and potentialities; (2) the defendant's criminal record and social history; (3) the circumstances of the offense; (4) the defendant's time in detention; (5) the harm to the victim, the victim's immediate family, and the community; (6) the

defendant's potential as a candidate for community service; (7) any mitigating circumstances relating to the offense; and (8) whether the defendant has a history of mental health or substance abuse problems. *Id.* § 901.3(1)(a)–(h).

Iowa's general sentencing statutes do not address risk-assessment tools such as the STATIC-99R and SOTIPS included in the psychosexual assessment attached to the PSI report in this case.[10] Our legislature *has* authorized the use of risk assessments in a few non-sentencing contexts. *See, e.g.*, *Id.* §§ 692A.128(2)(c) (mandating an application to modify sex-offender registration requirements to include "a validated risk assessment approved by the department of corrections" showing the offender was a low risk to reoffend), 692A.124(2) (requiring determination to use electronic tracking and monitoring to supervise a sex offender be based, in part, upon "a validated risk assessment approved by the department of corrections"), 901.12(3) (compelling board of parole to consider "a validated risk assessment" among other information when deciding

---

[10] Other jurisdictions have expressly approved the use of risk assessments as part of sentencing. *See, e.g.*, Ky. Rev. Stat. Ann. § 532.007(3)(a) (2017) ("Sentencing judges shall consider . . . the results of a defendant's risk and needs assessment included in the presentence investigation."); La. Stat. Ann. § 15:326(A) (2017) (providing certain Louisiana courts "may use a single presentence investigation validated risk and needs assessment tool prior to sentencing an adult offender"); Ohio Rev. Code Ann. § 5120.114(A)(1)–(3) (2017) (stating the Ohio department of rehabilitation and correction "shall select a single validated risk assessment tool for adult offenders" that shall be used for various purposes including sentencing); 42 Pa. Cons. Stat. § 2154.7(a) (2017) ("The commission shall adopt a sentence risk assessment instrument for the sentencing court to use to help determine the appropriate sentence within the limits established by law. . . ."); Va. Code Ann. § 17.1-803(5) (tasking sentencing commission with developing "an offender risk assessment instrument for use in all felony cases, based on a study of Virginia felons, that will be predictive of the relative risk that a felon will become a threat to public safety"); Wash. Rev. Code Ann. § 9.94A.500(1) (permitting sentencing court to "order the department [of corrections] to complete a risk assessment report.").

whether to release person on parole or work release), 904A.4(8)(a) (directing board of parole to implement risk assessment program). We also recognize our supreme court has recently promoted a pilot project where judges use a validated risk-assessment tool for making pretrial release decisions. *See Polk County Begins Pretrial Public Safety Assessment*, News Release (Jan. 16, 2018), https://www.iowacourts.gov/newsroom/news-releases/polk-county-begins-pretrial-public-safety-assessment/.

But so far, our legislature's only mention of risk assessments in the sentencing arena appears in Iowa Code section 901.11. Effective July 1, 2017, at the time of sentencing for certain felony drug offenses, felony child endangerment, and second-degree robbery, the district court shall determine when a convicted person first becomes eligible for parole or work release within certain statutory parameters based on pertinent information, including "a validated risk assessment." Iowa Code § 901.11(1)–(3).

The State does not cite a statute or rule specifically authorizing the use of an individual's risk level scores on the STATIC-99R or SOTIPS when deciding whether to impose incarceration on a sex offender. Rather, the State contends Gordon's risk level scores were permissible sentencing considerations under the catch-all language in section 901.2(1), that is, "the court shall receive . . . any information" offered which is "relevant to the question of sentencing." For trial purposes, evidence is relevant if "[i]t has any tendency to make a fact more or less probable than it would be without the evidence; and [t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. But different evidentiary rules govern sentencing than the trial itself. *See State v. Stanley*, 344 N.W.2d 564, 570 (Iowa

Ct. App. 1983). "The sentencing judge should be in possession of the fullest information possible concerning the defendant's life and characteristics and should not be denied an opportunity to obtain pertinent information by rigid adherence to restrictive rules of evidence properly applicable to trial." *Id.* (citing *State v. Cole*, 168 N.W.2d 37, 40 (Iowa 1969)). Despite this generally expansive view of facts helpful to sentencing courts, we cannot find on the record before us that Gordon's sex-offender risk level scores are the kind of information our legislature has deemed relevant to imposing a prison sentence.

As a matter of statutory interpretation, we find it significant that when revising section 901.11 to include "validated risk assessments" as pertinent information for a sentencing court in determining the length of a mandatory minimum sentence, the legislature elected not to likewise amend section 901.2 or 901.3 to list "validated risk assessments" among the relevant information to be included in the PSI report for all sentencing purposes. Neither did the legislature opt to add risk assessments to the list of factors for courts to consider before deciding to suspend a sentence or defer judgment under section 907.5(1). It would not have been difficult for the legislature to insert a clear directive regarding the use of risk assessments in the general sentencing statutes if it wished to embrace the approach advocated by the State. *See State v. Romer*, 832 N.W.2d 169, 177–78 & n.6 (Iowa 2013) (declining to read an "emotionally dependent" requirement into statute criminalizing student-teacher relationships, where analogous statute criminalizing sexual conduct with patients or clients expressly required emotional dependence, and stating if legislature intended to include term, it could have done so); *see also Wolverine Power Coop. v. Dep't Envtl. Quality*, 777 N.W.2d 1, 10

(Mich. Ct. App. 2009) ("When the Legislature includes a provision in one statute and omits the provision in a related statute, the Court should construe the omission as intentional and should not include an omitted provision where none exists."); *Foster v. Wash. State Dep't of Ecology*, 362 P.3d 959, 967 (Wash. 2015) ("[W]here the legislature includes language in one statute but omits it in another, we must presume that different meanings were intended."). Without the legislature's blessing, we are reluctant to find Gordon's risk assessment scores were pertinent information for determining sentence.

But even if our general sentencing statutes allow district courts to consider validated risk assessments for certain purposes, the State has not established that the STATIC-99R or SOTIPS tools were designed to assist with the kind of indeterminate sentencing decisions shouldered by Iowa judges.[11] The State correctly notes we have upheld the use of the STATIC-99 and similar instruments in a sexually violent predator commitment cases. *See In re Det. of Holtz*, 653 N.W.2d 613, 619 (Iowa Ct. App. 2002); *see also In re Det. of Pierce,* 748 N.W.2d 509, 513–14 (Iowa 2008) ("An actuarial assessment provides an 'empirically

---

[11] Notably, the American Law Institute in the proposed final draft of section 6B.09 of the Model Penal Code: Sentencing encourages the use of actuarial risk assessment tools by sentencing judges if a state sentencing commission has determined the instruments are "sufficiently reliable" and can be incorporated into sentencing guidelines. Model Penal Code: Sentencing § 6B.09(1) (Am. Law Inst., Proposed Final Draft 2017). Because the Model Penal Code features a determinate sentencing scheme, "no parole-releasing agency exists to pass such judgments." *Id.* § 6B.09(1) cmt. a. The commentary to this provision advocates "an attitude of skepticism and restraint concerning the use of high-risk predictions as a basis of elongated prison terms, while advocating for the use of low-risk predictions as grounds for diverting otherwise prison-bound offenders to less onerous penalties." *Id.* Iowa, of course, has an indeterminate sentencing scheme for felony convictions. And as expressed above, it is not clear if our legislature intends to assign the task of risk assessment based on validated actuarial tools to both sentencing courts and the board of parole.

measured rate of recidivism among a group of sex offenders who share a set of characteristics with the subject of the evaluation.'" (citation omitted)). But risk assessment tools validated for one purpose may not be fit for another. *See* National Center for State Courts, *NCSC Fact Sheet: Evidence-Based Sentencing* 2 (August 2014), www.ncsc.org/~/media/Microsites/Files/CSI/EBS Fact Sheet 8-27-14.ashx (explaining risk at sentencing may be assessed through the use of validated actuarial risk and needs assessment tools and those tools "should not be confused with tools designed for use at other points in the criminal process (e.g. pretrial or reentry), other types of recidivism risk (e.g., risk of committing a violent or sex crime) or screening tools that consist of a few, mostly static items used to determine risk for supervision purposes only").

Gordon does not fault the district department of corrections for including the risk scores in the psychosexual assessment appended to the PSI. But he claims their purpose was limited to program planning by correctional authorities subsequent to sentencing. *See* Iowa Code § 901.2(4). He contends the sentencing court improperly relied on his risk level scores to determine he should be incarcerated. *See Loomis*, 881 N.W.2d at 769 ("[U]sing a risk assessment tool to determine the length and severity of a sentence is a poor fit."). Gordon also maintains the sentencing court did not appreciate that "the risk assessment scores were based on group data and not specific to this individual defendant." *See* Katherine Freeman, *Algorithmic Injustice: How the Wisconsin Supreme Court Failed to Protect Due Process Rights in State v. Loomis*, 18 N.C.J.L. & Tech. On. 75, 89 (2016) ("[T]he fact that the algorithm calculates scores based on group data effectively shoehorns a defendant into a grouping score.").

The State acknowledges the scores were "preceded by explanatory information, including, for the STATIC-99R, the fact that the scores do not predict an individual's risk of reoffending." The assessment also noted it was "prepared expressly for the department of correctional services" and did not suggest it should be considered by the sentencing court. Yet the sentencing court did not heed those warnings. In giving reasons for imposing a prison sentence, the court highlighted Gordon's risk-assessment scores. The court indicated the SOTIPS score measured "the level of risk [Gordon] posed to the community" and placed Gordon "in a high-risk category." The court then rejected the PSI recommendation for probation and sentenced Gordon to an indeterminate ten years of incarceration.

Nothing in our record indicates the actuarial tools at issue here were designed to calculate risk-of-reoffending scores at an individual level or for sentencing purposes. Nothing in our record indicates the existence of validation studies for these tests or any cross validation for an Iowa population of offenders. Without those assurances, we cannot be confident the sentencing court's reference to Gordon's risk level scores was anything but an "off-label" use of these risk assessment instruments. *See* Chanenson, *supra*, at 7–8 (noting "there is reason to be concerned that regardless of their good intentions off-label users of at-sentencing risk assessment instruments may not fully grasp the complexities involved," for example, judges may be "employing commercially available actuarial risk assessments on an ad hoc basis" even if "the instrument in question was not designed to be used at sentencing or was not validated on the relevant population").

The State offers an alternative argument that the district court "did not rely upon the risk assessment instruments in imposing sentence, it considered them. It mentioned Gordon's scores on the STATIC-99R and SOTIPS among its many reasons for imposing a term of imprisonment upon Gordon's conviction of third-degree sexual abuse." We are not persuaded that the difference between *reliance upon* and *consideration of* these actuarial estimates saves the sentencing process in this case. Our supreme court has long held that it cannot "speculate about the weight" that the district court has "mentally assigned" to an impermissible factor "or whether it tipped the scales to imprisonment." *Messer*, 306 N.W.2d at 733; *see also State v. Lovell*, 857 N.W.2d 241, 243 (Iowa 2014) (striking down sentence because appellate court could not "evaluate the influence" of impermissible sentencing factors). While the district court in Gordon's case thoroughly discussed other pertinent sentencing factors, the record shows it assigned some importance to his risk-assessment scores. *Compare Loomis*, 881 N.W.2d at 770 (noting "the record reflects that although the circuit court referenced the risk assessment at sentencing, the court essentially gave it little or no weight"), *with Malenchik*, 928 N.E.2d at 568 (observing "sentencing decision was clearly based on factors apart from the defendant's LSI–R and SASSI results"). Because the district court considered Gordon's risk level scores as an aggravating factor when imposing sentence, and we find no statutory authority for using these instruments for that purpose, we vacate his prison term and remand for resentencing.

## B. Impermissible Sentencing Consideration

In his second claim, Gordon contends the district court abused its discretion in considering his post-plea arrest as a sentencing factor. Gordon argues the court

improperly relied on his pending drug-possession charge and the alleged circumstances surrounding it in reaching its sentencing decision. The State notes that Gordon revealed during the PSI that he used marijuana and methamphetamine in late January 2017 and admitted at the sentencing hearing that he was with a young woman, though was not aware of her age or her status as a runaway, at the time of his arrest. Because Gordon admitted certain facts, the State argues the district court could properly consider his "risky behavior" as part of its sentencing decision.

Because we vacate Gordon's sentence based on the risk-assessment claim, we do not reach his second contention. At resentencing, we caution the district court to consider only circumstances that are proven or admitted.

## IV. Summary

To recap, we vacate Gordon's sentence and remand for a new sentencing hearing without consideration of his risk level scores as an aggravating factor on this state of the record. "We do not suggest what the [new] sentence should be." *State v. Black*, 324 N.W.2d 313, 316 (Iowa 1982).

**SENTENCE VACATED AND REMANDED FOR RESENTENCING.**

Danilson, C.J., and Vaitheswaran, Potterfield, and Bower, JJ., concur; Vogel, Doyle, Mullins, and McDonald, JJ., dissent.

**MCDONALD, Judge.** (dissenting)

I disagree with the majority's decision to advance and decide claims not presented, briefed, or argued by the parties. I also disagree with the majority's resolution of the claims it raises. I respectfully dissent.

I.

The majority decides the district court abused its discretion in considering risk assessment information at sentencing and in using the information in making the determination whether Gordon should be incarcerated or supervised in the community. These are not the claims Gordon presented. As framed by Gordon, the question presented on appeal is whether the "district court violated Gordon's due process rights by consideration of and reliance on the sex offender risk assessments in imposing sentence." Gordon did not present or brief claims that the district court's consideration of and reliance on these risk assessments constituted an abuse of discretion. Indeed, when defense counsel was asked during oral argument whether Gordon's claim encompassed abuse-of-discretion claims, defense counsel responded no. Nonetheless, the majority raises and decides these claims on its own even though counsel specifically rejected the invitation.

There is no authority for the court to raise and decide these claims under the circumstances presented. This court is a court of error correction. *See* Iowa Code § 602.5103 (providing the court of appeals "constitutes a court for correction of errors at law"). "Our obligation on appeal is to decide the case within the framework of the issues raised by the parties . . . [and] do no more and no less." *Feld v. Borkowski*, 790 N.W.2d 72, 78 (Iowa 2010). This is the general rule. *See,*

*e.g., Doe v. Roe,* 931 P.2d 1115, 1120 (Ariz. Ct. App. 1996) ("We do not have an obligation or a mandate to raise an issue which the parties have not and then decide the case on that issue with no notice to the parties and no briefing or argument from them."); *Vanguard Envtl., Inc. v. Curler*, 190 P.3d 1158, 1161 n.4 (Okla. Civ. App. 2007) (stating an appellate court is "confined to the issues raised by the parties and presented by the proof, pleadings, petition in error and briefs"); *Bank of America, N.A. v. Edwards,* 93 N.E.3d 212, 216 (Ohio Ct. App. 2017) (stating "the scope of our review is limited to the issues the parties have chosen to raise in their respective assignments of error"); *Clark Cty. v. W. Washington Growth Mgmt. Hearings Review Bd.*, 298 P.3d 704, 709 (Wash. 2013) ("However, an appellate court must not adjudicate resolved claims that are separate and distinct from the underlying disputes actually raised on appeal; such extraneous claims need not be adjudicated in order to properly decide a case on appeal, and such judicial action needlessly disturbs resolved matters, wastes judicial resources, creates unfair surprise, interferes with and deters private settlements, and risks insufficient advocacy on review.").

The cases upon which the majority relies do not contravene the general rule. The majority cites *State v. Ochoa*, 244 N.W.2d 773, 775 (Iowa 1976), for the proposition that we prefer to decide cases on non-constitutional grounds even though the constitutional issue has been properly presented. However, in that case, the defendant raised both constitutional and non-constitutional claims. *See Ochoa*, 244 N.W.2d at 774. The court thus had the choice to decide the non-constitutional issue. In *In re S.P.*, 672 N.W.2d 842, 846 (Iowa 2003), the court resolved a non-constitutional statutory claim not presented but the claim was

jurisdictional and resolution of the jurisdictional claim was necessary to and part and parcel of the constitutional claim. *See S.P.*, 672 N.W.2d at 846 ("[W]e think the court of appeals was nevertheless required to address the lack-of-notice issue. Michael's contention goes to the heart of the district court's jurisdiction.").

I disagree with the majority's decision to assume the role of advocate and raise claims on Gordon's behalf. "This court is not a roving commission that offers instinctual legal reactions to interesting issues that have not been raised or briefed by the parties and for which the record is often entirely inadequate if not completely barren. We decide only the concrete issues that were presented, litigated, and preserved in this case." *City of Davenport v. Seymour*, 755 N.W.2d 533, 545 (Iowa 2008).

## II.

Although I do not think the abuse-of-discretion claim is properly before this court, I answer the majority opinion because I disagree with the majority's resolution of its own claims. "Only the district court judge, with boots on the ground, looks into the defendant's eyes before imposing sentence—appellate judges reviewing a cold transcript and presentence investigation report are 'Johnny-come-latelies' who should afford the district court due deference." *United States v. Van Nguyen*, 602 F.3d 886, 896 (8th Cir. 2010), *abrogated on other grounds by Honeycutt v. United States*, 137 S. Ct. 1626 (2017). The majority does not afford the district court the deference owed under the circumstances presented.

## A.

The majority first concludes the district court did not have the authority to consider the risk assessments at the time of sentencing. For the reasons set forth

in my dissenting opinion in *State v. Guise*, filed today, I disagree. In sum, the code and our case law allow the district court to consider at sentencing "any information" relevant, pertinent, or helpful to the sentencing function. Risk assessment information qualifies as "any information" helpful to the sentencing function. *See* John Monahan and Jennifer L. Skeem, *Risk Assessment in Criminal Sentencing*, Annual Review of Clinical Psychology 493 (2016), downloaded from http://risk-resilience.berkeley.edu/sites/default/files/journal-articles/files/annurev-clinpsy-021815-092945.pdf. ("Risk assessment can provide an empirical estimate of whether an offender has a sufficiently high likelihood of again committing crime to justify incapacitation."); *id.* at 494 ("Risk assessment can provide an empirical estimate of whether an offender has a sufficiently low likelihood of committing additional crime to justify an abbreviated period of incapacitation, supervised release . . ., or no incapacitation at all.").

Consider the assessments at issue in this case. Our courts and other courts have held sex-offender risk assessments are sufficiently reliable to be relevant to the determination to civilly commit a sex offender due to the risk of future offenses and not as punishment for a crime previously committed. *See In re Det. of Holtz*, 653 N.W.2d 613, 619 (Iowa App. 2002); *see also People v. Poe*, 88 Cal. Rptr. 2d 437, 440 (Cal Ct. App. 1999) (upholding use of RRASOR); *Garcetti v. Superior Court*, 102 Cal. Rptr. 2d 214, 241 (Cal. Ct. App. 2000) (upholding use of PCL–R, RRASOR and Static 99); *In re Clark*, No. 117,598, 2017 WL 6062537, at *2 (Kan. Ct. App. Dec. 8, 2017) (evaluating SOTIPS in commitment proceeding); *Commonwealth v. Reese*, 2001 WL 359954 at *9 (Mass. Super. Apr. 5, 2001) (stating "statistics, in general, are better predictors of future sexual dangerousness

than clinical judgments"); *In re Det. of Campbell*, 986 P.2d 771, 779 (Wash. 1999) (holding reliance on actuarial and clinical assessment proper and weight to be given evidence is question for the jury). *See also State, ex rel. Romley v. Fields*, 35 P.3d 82, 89 (Ariz. Ct. App. 2001) ("[U]se of actuarial models by mental health experts to help predict person's likelihood of recidivism is not the kind of novel scientific evidence or process to which Frye applies."). If our courts have approved the use of sex offender risk assessment instruments in determining whether civil commitment is necessary to avoid future crime, it logically follows the same instruments are relevant, pertinent, or helpful—even if only minimally—in determining the level of supervision appropriate for an offender for a crime actually committed.

There are additional reasons to conclude the district court did not abuse its discretion in considering the risk assessments in this case. First, Gordon consented to its use. In this case, prior to the start of the psychosexual assessment, the evaluator informed Gordon of the purposes of the interview—"to assess [his] potential risks to the community, treatment needs, and amenability to treatment"—the consequences to him from the evaluation, that the assessor was "writing a report that would become part of the court/corrections file," that Gordon had a right not to answer questions or participate in the interview, and "that his decision whether or not to participate in the interview would not be interpreted as meaning he was hiding something." Gordon stated he understood this, and he agreed to participate. He signed an informed consent acknowledging the same. Gordon never objected to undergoing the evaluation and never objected to the evaluation being included in the "court/corrections file."

Second, as a matter of substantive sentencing law, it is well-established "[i]n determining a defendant's sentence a district court is free to consider portions of a presentence investigation report that are not challenged by the defendant." *State v. Grandberry*, 619 N.W.2d 399, 402 (Iowa 2000). This rule applies to uncontested "data in the presentence investigation report obtained from other sources." *Id.* Here, the evaluator's psychosexual assessment and the challenged risk assessment information were included in the presentence investigation report prior to the sentencing hearing. Counsel was provided with the presentence investigation report prior to sentencing in compliance with the Code. *See* Iowa Code § 901.4 (providing defense counsel shall have access to the presentence investigation report at least three days prior to sentencing). At the time of the sentencing hearing, Gordon's counsel stated Gordon had no objection to the district court's consideration of the presentence investigation and the information contained therein.

The majority attempts to overcome this issue by concluding Gordon had no need to object to the information because the consideration of risk assessment information is a per se impermissible sentencing factor equivalent to the defendant's race. *See* Ante at 7 n.4. I respectfully disagree that the district court's consideration of actuarial risk assessment information is the same as consideration of the defendant's race. The majority's position—that actuarial risk assessment information is a per se impermissible factor akin to race that need not be objected to—is contrary to the position taken by our sister States that have examined the issue, contrary to the position of the National Center for State Courts, contrary to the position of the National Conference of Chief Justices, and contrary

to the position of the American Law Institute. In addition, the majority's position is inconsistent. If risk assessment information is per se an impermissible sentencing factor to which the defendant does not need to object, then no amount of foundation regarding the validity of the instrument would allow for its consideration. However, if, as the majority seems to suggest, sufficient foundation could be laid to allow for the use of risk assessments, then the failure to object bars the claim. *See State v. Witham*, 583 N.W.2d 677, 678 (Iowa 1998) (explaining that district court was free to consider mental health evaluation contained in unchallenged presentence investigation report); *State v. Gonzalez*, 582 N.W.2d 515, 517 (Iowa 1998) (finding that district court properly relied on defendant's statements in the presentence investigation report which amounted to an admission of other criminal activity because the statements were not challenged by defendant when he was given an opportunity to do so); *State v. Townsend*, 238 N.W.2d 351, 358 (Iowa 1976) (finding that district court acted properly in considering the presentence investigation report that contained psychiatric evaluation and recommendation defendant be placed in a semi-structured environment where the defendant did not challenge the pertinent parts of the report); *State v. Delano*, 161 N.W.2d 66, 71 (Iowa 1968) ("He did not see fit to make an objection at that time. We must assume that, in the absence of evidence to the contrary, the court made proper use of the report and did not give consideration to anything based only upon rumor or at a stage prejudicial to defendant."); *State v. Buck*, No. 14-0723, 2015 WL 1046181, at *3 (Iowa Ct. App. Mar. 11, 2015) (concluding the defendant did not preserve his challenge to the district court's consideration of the sexual adjustment inventory at sentencing); *State v. Thonethevaboth*, No. 05-1821, 2006 WL 1751295, at *1 (Iowa

App. June 28, 2006) (holding error was not preserved where counsel did not object to the list of prior convictions set forth in presentence investigation report).

B.

The majority also holds the district court abused its discretion in considering the risk assessment information as an "aggravating factor" in deciding the defendant should be incarcerated rather than released into the community with supervision. The majority's conclusion is directly contrary to the authorities upon which it relies, is unworkable in Iowa's indeterminate sentencing scheme, and is contrary to the administration of justice.

The majority opinion is actually contrary to *Loomis.* In *Loomis*, the sentencing court denied the defendant's request for probation and ordered the defendant be incarcerated based, in part, on the risk assessment information contained in the presentence investigation report. *See State v. Loomis*, 881 N.W.2d 749, 755 (Wis. 2016) ("In terms of weighing the various factors, I'm ruling out probation because of the seriousness of the crime and because your history, your history on supervision, and the risk assessment tool that have been utilized, suggest that you're extremely high risk to reoffend."). The defendant contended the district court's consideration of the risk assessment to support a prison sentence violated his right to due process and constituted an abuse of discretion. *Loomis* held the defendant's right to due process was not violated. *See* 881 N.W.2d. at 771 ("Accordingly, we determine that the circuit court's consideration of COMPAS in this case did not violate Loomis's due process rights."). The court also held the sentencing court did not "erroneously exercise its discretion" because the sentencing court considered other factors and the risk assessment was "not

determinative." *Id.* at 753. While the *Loomis* court stated risk assessment information should not be considered an aggravating circumstance, it was referring to the use of such information to increase the length of an offender's sentence within Wisconsin's determinate sentencing scheme. *See id.* at 768. *Loomis* cannot be interpreted to prohibit the sentencing court's use of risk assessment information in ordering incarceration because *Loomis* affirmed the defendant's sentence of incarceration.

This understanding of *Loomis* was confirmed in *State v. Jones*, 2015AP2211-CRNM, 2016 WL 8650489, at *1 (Wis. Ct. App. Nov. 29, 2016). In that case, the Wisconsin Court of Appeals applied *Loomis* and held the sentencing court's consideration of the COMPAS risk assessment as a factor in imposing a prison sentence was not a violation of due process or otherwise improper where the risk assessment was only one of many factors considered at sentencing. *See Jones*, 2016 WL 8650489 at *5 ("Our review of the trial court's comments on the COMPAS report leads us to conclude there would be no arguable merit to assert that the trial court's use of the COMPAS report was improper or denied Jones due process. The trial court commented on the report only briefly, and its comments implied that the report was one of many factors it was considering.").

The majority opinion is actually contrary to *Malenchik*. In *Malenchik*, the defendant challenged his six-year prison sentence, contending "it was improper for the trial court to take into consideration the LSI-R score." 928 N.E.2d 564, 567 (Ind. 2010). The Indiana Supreme Court held "that the results of LSI–R and SASSI offender assessment instruments are appropriate supplemental tools for judicial consideration at sentencing. These evaluations and their scores are not intended

to serve as aggravating or mitigating circumstances nor to determine the gross length of sentence, but a trial court may employ such results in formulating the manner in which a sentence is to be served." *Id.* at 575. While the court stated risk assessment information should not be used as aggravating or mitigating circumstances, it did so in the context of finding aggravating and mitigating circumstances within Indiana's determinate sentencing scheme. *See id.* at 569 (describing Indiana's statutory sentencing scheme); *Anglemyer v. State*, 868 N.E.2d 482, 487–92 (Ind. 2007) (explaining sentencing scheme and use of aggravating and mitigating factors within the scheme). *Malenchik* made clear that risk assessment information can be considered in the initial decision to incapacitate the defendant or suspend sentence. *See* 928 N.E.2d at 573 ("But such evidence-based assessment instruments can be significant sources of valuable information for judicial consideration in deciding whether to suspend all or part of a sentence, how to design a probation program for the offender, whether to assign an offender to alternative treatment facilities or programs, and other such corollary sentencing matters."). *Malenchik* cannot be interpreted to prohibit the sentencing court's use of risk assessment information in ordering incarceration because *Malenchik* affirmed the defendant's sentence of incarceration.

In addition to being contrary to the relevant persuasive precedents, the majority opinion is contrary to the position of the National Center for State Courts. In 2011, the National Center for State Courts published nine guiding principles for the use of risk assessment information in sentencing. *See generally* Pamela M. Casey et al., *Using Offender Risk and Needs Assessment Information at Sentencing: Guidance for Courts from a National Working Group*, National Center

for State Courts 1 (2011), http://www.ncsc.org/~/media/microsites/files /csi/rna%20guide%20final.ashx. Both the Conference of Chief Justices and Conference of State Court Administrators subsequently endorsed these principles. The first principle is as follows:

> Risk and need assessment information should be used in the sentencing decision to inform public safety considerations related to offender risk reduction and management. It should not be used as an aggravating or mitigating factor in determining the severity of an offender's sanction.

*Id.* at 11. The national working group made clear that "aggravating factor" referred to the length and severity of the sentence and not the decision of whether to order incarceration or suspend the sentence. The offender's risk to offend and his amenability to supervision in the community is directly relevant to the incarceration/probation decision. The guiding principles provide:

> This is the approach taken in *Malenchik* . . . , the first state court appellate decision to discuss the use of RNA information at sentencing. In *Malenchik*, the Indiana Supreme Court distinguishes the use of RNA information for the purpose of punishing the offender's criminal behavior from the use of RNA information for the purpose of deciding whether to suspend all or part of an offender's sentence and grant probation. The nature and extent of the penalty or sanction to be imposed for the purpose of punishing the offender depends upon factors such as the culpability of the offender, the gravity of the offense committed, the offender's prior criminal record, and the nature and extent of resulting harm to victims and community. The *Malenchik* decision specifically states that RNA information should not be used as a mitigating or aggravating factor in determining the offender's appropriate punishment for the offense. In deciding whether to suspend all or a portion of a term of imprisonment and grant probation, however, the court considers not only the purpose of punishment but also all of the other purposes of sentencing including whether the risk of re-offense presented by the offender can be safely managed and effectively reduced through community supervision and services, i.e., whether the offender is amenable to community supervision. . . . *Malenchik* recognizes that 'evidence-based assessment instruments can be significant sources

of valuable information for judicial consideration in deciding whether to suspend all or part of a sentence.'

*Id.* at 13 (quoting *Malenchik*, 928 N.E.2d at 573).

The National Center for State Courts reiterated its position more recently, concluding that a risk assessment should not be used to increase the severity of an offender's sentence but should be considered in making the determination of whether the defendant can be supervised in the community or whether incapacitation is required:

> RNA [risk and needs assessment] information may inform judicial decisions regarding imprisonment when making a corrections-related assessment of the offender's amenability to probation supervision. The offender's risk level may be an important, though not determinative, factor in assessing amenability. In making decisions about amenability and other placement decisions for the purpose of reducing recidivism risk, the offender's criminogenic needs and the availability of appropriate supervision, treatment, and intermediate sanction resources in the community are also considered.

Pamela Casey, Jennifer Elek, and Roger Warren, *Use of Risk and Needs Assessment in State Sentencing Proceedings*, National Center for State Courts 1, 3 (Sept. 2017), http://www.ncsc.org/~/media/Microsites/Files/CSI/ EBS%20RNA% 20brief%20Sep%202017.ashx.

The majority opinion is also contrary to the position of the American Law Institute as expressed in the Model Penal Code: Sentencing. The final draft, adopted in May 2017, recommends the development and use of actuarial assessments of risk at the time of sentencing. *See* Model Penal Code: Sentencing § 6B.09 (Am. Law Inst., Proposed Final Draft 2017). Contrary to the National Center for State Courts, the ALI explicitly takes the position that risk assessments

can be used as aggravating factors to increase the severity of punishment. The

Model Penal Code

> would permit the use of actuarial offender risk assessments as a
> basis for punishments more severe than offenders would otherwise
> have received. Judgments—or guesses—about offenders' future
> criminality have long been integral to American criminal-justice
> systems at the judicial sentencing stage and, even more significantly,
> in the decisions of parole boards. Subsection (2) contemplates
> substantive risk-based decisions comparable to those historically
> made by paroling agencies, but now considered in open court, with
> a full record, and ultimately subject to appellate review. . . . One
> fundamental goal of § 6B.09 is to bring transparency and
> accountability to a part of the sentencing system that has long
> existed in darkness.

*Id.* § 6B.09, cmt. e.

The mere fact the majority's opinion is contrary to all of the relevant

authorities is not necessarily dispositive of the issue. The authorities are

persuasive and not controlling. In the absence of controlling authority, the majority

is free to determine whether and how risk assessment information is to be used in

sentencing proceedings in Iowa. In making that determination, the majority is free

to blaze a solitary path. But, the solitary path should lead to some end. And this

is my largest point of contention with the majority. The majority is building doctrine

for doctrine's sake without advancing the administration of justice.

The majority's aggravating-factors approach taken from *Loomis* and

*Malenchik* is inapplicable and unworkable within our indeterminate sentencing

scheme. *Loomis* and *Malenchik* both involve the use of aggravating and mitigating

factors in determinate sentencing schemes in which the sentencing court sets the

length of the sentence within a discretionary sentencing range. In felony cases in

Iowa, outside the context of consecutive sentences, the sentencing decision for

the district court is binary—either the defendant should be incarcerated or supervised in the community. The majority's holding that it is impermissible for the sentencing court to consider risk assessment information in determining whether an offender should be incapacitated or supervised in the community thus makes little sense. There is no other sentencing decision to be made. Does the majority mean a sentencing court is prohibited from imposing a sentence of incarceration if the sentencing court read the presentence investigation report and the risk assessment information contained therein prior to sentencing? The answer is unclear.

In addition, the majority has paid insufficient attention to justice-related concerns. The duty of the sentencing judge in every case is to consider all of the available sentencing options, to give due consideration to all circumstances in the particular case, and to exercise that option which will best accomplish justice both for society and for the individual defendant. *See State v. McKeever*, 276 N.W.2d 385, 388 (Iowa 1979). The sentencing judge's function is both backward-looking and forward-looking: backward looking in that the judge must impose a sentence that provides justice in the individual case; forward looking in that the judge must select a sentence that advances the "societal goals of sentencing criminal offenders, which focus on rehabilitation of the offender and the protection of the community from further offenses." *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). Reaching a just sentence that balances these competing considerations is an "arduous task." *Id.* at 725. Historically, the sentencing judge has made the sentencing decision intuitively based on nothing more than the judge's subjective balancing of these competing considerations as informed by the judge's personal

experience. But even then, experience has its limits; every offender is an individual, and each case is unique. Evidence-based risk assessment information can assist the sentencing judge in overcoming the limits of personal experience by providing access to empirical evidence. *See* Monahan and Skeem, *Risk Assessment in Criminal Sentencing*, Annual Review of Clinical Psychology at 493-94. The use of evidence-based risk assessment information can bring greater transparency, consistency, and procedural fairness to the sentencing process. *See* MPC § 6B.09, cmt. a.

The majority opinion, by making this area of law unnecessarily unclear, will retard the use of risk assessment information at sentencing—or, at least, the transparent use of risk assessment information at sentencing. In the real world, after the majority opinion is filed, the sentencing judge will continue to review risk assessment information contained in the file. One, the judge has to because the judge has to read the presentence investigation report prior to sentencing. Two, the judge wants to because the information is relevant to the sentencing decision. However, at the time of sentencing, the sentencing judge will not at all mention the fact that he or she read the risk assessment. The sentencing judge does not want to get reversed for making the not-so-great inferential leap that an offender classified as a high risk to reoffend might pose a greater risk than an offender classified as a low risk to reoffend. *See* Monahan and Skeem*,* Annual Review of Clinical Psychology at 505-06 (noting it is a "canard" that "predictions of future offending cannot be achieved, with any degree of confidence, in the individual case" and noting the more recent literature shows "technical statistical arguments against actuarial risk estimation are simply fallacious"). And I, for one, would not

blame the sentencing judge. Consider this case. In an argument not raised on appeal, the majority opinion holds the district court abused its discretion in considering an unchallenged risk assessment in the presentence investigation report that told the district court the defendant—who pleaded guilty to having sex with a fourteen-year-old girl and who was caught while on pretrial release in the company of another teenager (and with methamphetamine in his possession)—is a high risk to reoffend.

The end result of the majority opinion will be less transparency, less consistency, and less procedural fairness. The better position is to conclude the district court can consider risk assessment information in making the decision to incarcerate an offender so long as the risk assessment information is not the determinative factor. This is the same rule we apply with respect to all sentencing decisions and is easily applicable with respect to actuarial risk assessment information. *See State v. Hopkins,* 860 N.W.2d 550, 554 (Iowa 2015) (recognizing that the seriousness and gravity of the offense is an important factor in determining what sentence to impose but noting the nature of the offense cannot alone be determinative); *State v. Cooley*, 587 N.W.2d 752, 755 (Iowa 1998) (discussing the rule that "[e]ach sentencing decision must be made on an individual basis, and no single factor alone is determinative"); *State v. Morrison*, 323 N.W.2d 254, 256 (Iowa 1982) ("A sentence must fit the person and circumstances. Each decision must be made on an individual basis, and no single factor is alone determinative."); *State v. Arrington*, No. 16-0584, 2016 WL 6270057, at *2 (Iowa Ct. App. Oct. 26, 2016) ("In order to review the exercise of its discretion, the sentencing court must state on the record its reasons for selecting the sentence imposed. Each

sentencing decision must be made on an individual basis, and no single factor alone is determinative."); *see also Malenchik*, 928 N.E.2d at 573 (stating "the assessment tool scores may, and if possible should, be considered to supplement and enhance a judge's evaluation, weighing, and application of the other sentencing evidence in the formulation of an individualized sentencing program appropriate for each defendant"); *Loomis*, 881 N.W.2d at 760 ("Further, we set forth the corollary limitation that risk scores may not be considered as the determinative factor in deciding whether the offender can be supervised safely and effectively in the community."). As applied to actuarial risk assessment information, this rule would encourage sentencing judges to obtain more information and not less. This rule would encourage judges to be more transparent in their decision-making process. This rule would encourage greater consistency in the sentencing process. This rule would provide greater procedural fairness to the litigants. This rule would also encourage lawyers to challenge the risk assessment information in open court to the extent the lawyers believed the actuarial risk assessment is flawed or otherwise inapplicable to the sentencing decision at issue. *See* MPC § 6B.09, cmt. a (explaining the superior position of "domesticating" the "use of risk assessments by repositioning them in the open forum of the courtroom").

C.

Under the traditional rule applicable to all sentencing decisions, I cannot conclude the district court abused its discretion in imposing Gordon's sentence. The majority gives short-shrift to the district court's thorough articulation of the reasons for imposition of sentence:

I look at a lot of different factors when I'm trying to come up with what I believe to be an appropriate sentence.

I look at your age.

I look at your prior record of convictions.

I look at your employment circumstances. You're unemployed.

Your prior record of convictions is set forth in the presentence investigation report. Multiple, multiple driving offenses. You had possession of controlled substance in Mitchell County. You got possession of alcohol. You got a reckless driving.

I look at your family circumstances. While I understand you live with your folks, apparently, you don't consider them a strong support system because you described your relationship with them as distant.

I look at your financial circumstances, which are poor. You have a lot of debt, a lot of unpaid fines, loans, and you're unemployed.

Your previous employment, while you had previous employment, I guess I would call somewhat concerning because one of your employers terminated you due to absences, which attributed – were attributed to by your methamphetamine abuse.

I look at whether a weapon or force was used in the commission of the offense.

I look at your needs for rehabilitation and your potential for rehabilitation. And I look at that in terms of your rehabilitation and if that can be accomplished in the community versus a more structured environment like prison.

I have concerns that you're all over the board with whether you think this offense was committed by you or not. I was here for your guilty plea, and you admitted the offense. You denied it throughout the presentence investigation report. Apparently, you denied it to your folks or said that they didn't believe it had occurred. And today you're telling me you did have a sexual relationship with this gal. So you're kind of all over the board with this. What that means to me is not so much, gosh, you've been dishonest, but it's – it's how amenable I think you are to treatment.

I also have concerns about the continued high-risk behavior being in – being with a juvenile female who obviously has got other issues going on, and a possession of methamphetamine floating around there also. I get that it's not a conviction, and I distinguish that, and I understand that, but I look at a person's behavior after they've been charged with something like this and if that's a wake-up call to them.

I look at our necessity for protecting the community, which obviously ties into some of the other comments I made. And I look at how this outcome is going to deter you from future offenses or is

going to deter other people in the community from committing these types of offenses.

You've got a long history of drug abuse, and I get this isn't a drug crime. But you've freely said, When I use methamphetamine, I'm less sexually inhibited, and I think more about sex, and I use it purposefully to enhance my sexual activity. So those things in that fashion are tied together.

In looking at your psychosexual evaluation, I note that on the STATIC-99R score, which was a risk level score, you were given a Level III, average risk. On the SOTIPS score, you were given a high risk assessment, placed in a high-risk category. And what that sex offender treatment intervention progress scale is supposed to tell me is your supervision needs, your progress—basically, what progress we can anticipate through treatment, taking responsibility, looks at a lot of different factors. And that places you as high risk. Treatment amenability is based upon looking at your willingness to admit your behavior and take responsibility and the level of risk you pose to the community.

All of these things, in looking at it, tell me that an appropriate sentence in this matter would sentence you up to ten years in the Iowa state prison system.

The district court considered multiple factors, and the risk assessment information was not determinative. In comparison, the district court's decision in this case was more thorough and more considered than the sentencing decision affirmed in *Loomis*. *See Loomis*, 881 N.W.2d at 755 ("In terms of weighing the various factors, I'm ruling out probation because of the seriousness of the crime and because your history, your history on supervision, and the risk assessment tool that have been utilized, suggest that you're extremely high risk to reoffend."). More important, the district court used the risk assessment information as an aid in determining Gordon's supervision needs and amenability to treatment. Each of the majority opinion's cited authorities conclude this is the appropriate use of risk assessment information at sentencing.

The district court in this case did an exemplary job in assessing the relevant sentencing information and in articulating the reasons for sentence. There is no

abuse of discretion here. I would affirm the defendant's conviction and sentence. *See State v. Griffin*, No. 16-0877, 2017 WL 1095072, at *3 (Iowa Ct. App. Mar. 22, 2017) (holding the district court did not abuse its discretion in imposing sentence when relying on Iowa Risk Revised); *State v. Letscher*, No. 14-1851, 2015 WL 8390824, at *1 (Iowa Ct. App. Dec. 9, 2015) (affirming sentence where defendant was sentenced based on department risk assessments showing defendant was a high risk to reoffend), *reversed on other grounds by State v. Letscher*, 888 N.W.2d 880 (Iowa 2016); *State v. Buck*, No. 14-0723, 2015 WL 1046181, at *3 (Iowa Ct. App. Mar. 11, 2015) (concluding the defendant did not preserve his challenge to the district court's consideration of the sexual adjustment inventory at sentencing); *State v. Worthum*, No. 13-0464, 2014 WL 467966, at *1 (Iowa Ct. App. Feb. 5, 2014) (affirming sentence where district court used risk assessment tool); *see, e.g.*, *Malenchik*, 928 N.E.2d at 574 (holding the district court did not abuse its discretion in considering risk assessment information); *Loomis*, 881 N.W.2d at 771 (same); *Jones*, 2016 WL 8650489, at *5 (same).

III.

For the above-stated reasons, and for the reasons set forth in my opinion in *State v. Guise,* I respectfully dissent.

Vogel, Doyle, and Mullins, JJ., join this dissent.

**MULLINS, Judge** (dissenting).

I respectfully dissent, join in the dissent by Judge McDonald, and write separately.

I incorporate by this reference my dissent in the case of *State v. Guise*, No. 17-0589, ___ WL ___ (Iowa Ct. App. May 2, 2018), filed today. Although not all the arguments in that dissent are *directly* on point in this case, most of the principles and the analytical approach are applicable. Consistent with that dissent, failure of the legislature to specifically authorize or require use of risk assessments in sentencing does not necessarily mean a sentencing court abuses its discretion by considering such information. The question remains: is the assessment relevant or pertinent?

Our supreme court has approved the use of sex-offender assessments in restraining the liberty of sexually violent predators. *See In re Det. of Pierce,* 748 N.W.2d 509, 513–14 (Iowa 2008); *see also In re Det. of Holtz*, 653 N.W.2d 613, 619 (Iowa Ct. App. 2002). The evidence is relevant and admissible for juries to consider in those cases. Although they are technically civil trials, proof beyond a reasonable doubt is required because of the liberty interest at stake. How can we reconcile the admissibility of the sex-offender risk assessments for purposes of long-term institutional commitment of an individual with a refusal to allow a district court judge to consider that same or similar information among several factors in determining a tailor-made sentence for an individual criminal defendant? I cannot.

The trial court record in this case does not support reversal. It was Gordon's duty, and not this court's obligation, to make the adequate record. We should be slow, very slow, to expand the record to include articles and studies critical of risk

assessments without requiring the vetting of evidence that results from the adversarial process. The trial court record in this case is inadequate to support the result reached. I have no opinion as to whether a defendant would be able to develop a record to support a reversal, but I know it did not happen in this case.

Respectfully, I would affirm.

Vogel, Doyle, and McDonald, JJ., join this dissent.